Filed 4/15/14  Sham v. Tenet Healthsystem QA CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ELSAGAV SHAHAM,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>TENET HEALTHSYSTEM QA, INC., et al.,<br><br>    Defendants and Respondents. | B246549<br><br>(Los Angeles County<br>Super. Ct. No. BC466646) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan S. Rosenfeld, Judge.  Affirmed.

Elsagav Shaham, in propria persona, for Plaintiff and Appellant.

Law Offices of Mark T. Kawa and Mark T. Kawa for Defendant and Respondent Tenet HealthSystem QA, Inc.

Epstein, Becker & Green, Steven R. Blackburn and Matthew A. Goodin for Defendants and Respondents Hollywood Presbyterian Medical Center, LP, David Miller, Shobhana Gandhi, and Murphy Goodwin.

Elsagav Shaham, M.D., an obstetrician, filed the present action against Hollywood Presbyterian Medical Center (the hospital), its predecessor, and three individual physicians, alleging 15 causes of action arising out of peer review proceedings allegedly conducted between 2002 and 2009.  The trial court granted defendants' special motions to strike under the anti-SLAPP statute (Code Civ. Proc., § 425.16), concluding that each cause of action arose out of protected conduct and plaintiff failed to show a probability of prevailing on the merits.[1]  We find no error, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Complaint

Plaintiff filed the present action in propia persona on August 1, 2011.  On May 14, 2012, he filed a first amended complaint against the hospital, Tenet Hospital Corporation (Tenet), Shobhana Gandhi, M.D., David Miller, M.D., and T. Murphy Goodwin, M.D. (collectively, the physician defendants).  The first amended complaint alleges that each of "[t]he allegations in this complaint are due to Defendants' having conducted a malicious peer review designed to cause economic harm to Dr. Shaham," and it specifically alleges as follows:

In 2003, Tenet "pulled about 20 of [plaintiff's] cases and sent them for review to 'hired guns' in Texas."  When the physician defendants learned of these cases, "they began raising unfounded concerns about Dr. Shaham's clinical skills and judgment, all in an effort to have Dr. Shaham removed from the staff."  Sometime later, defendants Gandhi and Miller, at Tenet's instigation, started focused peer reviews of plaintiff based on unfounded "concerns."[2]  These reviews were done without plaintiff's knowledge or

---

[1]      "SLAPP" is an acronym for "strategic lawsuit against public participation."  All further statutory references are to the Code of Civil Procedure.

[2]      The complaint alleges that Gandhi and Miller initiated this peer review in 2007.  Plaintiff asserts in a declaration and in his appellant's reply brief that 2007 is a typographical error, and the correct date is 2003, not 2007.

2

participation, in violation of the advisements of the Joint Commission on Accreditation of Healthcare Organizations. When these informal peer reviews did not result in plaintiff's dismissal, the physician defendants initiated a more formal review with the Medical Executive Committee (MEC).

The physician defendants testified at the peer review proceeding, giving testimony that "was so erroneous that the only logical conclusion to be drawn was that it was given for a malicious purpose. The reviews and testimony were inaccurate, biased, arbitrary, and unreliable." The physician defendants were "insulting and denigrating of Dr. Shaham's experience and specifically denied Dr. Shaham's long record of experience, expertise and a track record of excellent care." Further, defendants "generated rumors, insinuations and complaints about [plaintiff] that were unsubstantiated and untrue" and "told other doctors on the MEC committee as well as owners of various clinics around the city of Los Angeles that [plaintiff] had a serious problem by suggesting that [plaintiff's] privileges had already been placed in abeyance, and that he had been reported to the state medical board." "Statements were made by each of them to the administrators of the San Judas Medical Group, and other doctors in the Hospital to attempt to cause ridicule and embarrassment, and to take over his patients." "In fact, the HOSPITAL, [Tenet], Gandhi, Miller and Goodwin each reported the Peer review which is required to be confidential to other doctors, and to Shaham's associates and colleagues at the San Judas medical centers before a final determination had been reached. [¶] . . . As a result[,] members of the medical community believe[d] his privileges were suspended and that his license [was] in jeopardy; he sustained a work loss, he lost many patients[,] and suffered financially."

Plaintiff was fully exonerated, and his privileges were reinstated. However, the fact that his privileges were wrongly subjected to peer review and outsiders were informed of the peer review has caused severe damage to plaintiff's medical practice: "Dr. Shaham's [o]bstetrics and gynecology practice has been ruined. He has been labeled as a dangerous doctor by the HOSPITAL. . . . [H]e has been 'blackballed' from working with any of the USC residents . . . . [¶] Quite simply, primary care physicians

3

are afraid to send their patients to an obstetrician whom the HOSPITAL has labeled 'dangerous.'"

Based on the foregoing allegations, plaintiff asserted 15 causes of action: (1) federal antitrust violations; (2) state antitrust violations; (3) breach of contract; (4) violations of the federal Health Care Quality Improvement Act; (5) business disparagement, slander, and libel; (6) tortious interference with business; (7) tortious interference with prospective economic advantage; (8) violations of the Deceptive Trade Practices Act; (9) intentional infliction of emotional distress; (10) application for temporary restraining order and temporary and permanent injunctions; (11) request for declaratory relief; (12) denial of due process; (13) violation of the California Medical Practice Act; (14) violation of Business and Professions Code section 809 et seq.; and (15) malicious peer review.

## II.     The Anti-SLAPP Motions

In August 2012, defendants filed special motions to strike under the anti-SLAPP statute.  The defendants contended that each of plaintiff's causes of action arose out of peer review, which is an "official proceeding authorized by law" within the meaning of the anti-SLAPP statute.  Further, plaintiff could not demonstrate a likelihood of success on the merits because his claims were barred by the applicable statutes of limitations, plaintiff failed to exhaust administrative and judicial remedies, and none of plaintiff's cases were ever sent to peer review.  Finally, Tenet contended that it sold the hospital in November 2004 and thus was not legally responsible for any alleged misconduct after that date.

Plaintiff opposed the anti-SLAPP motions, urging that the peer review process is not absolutely privileged and there is no protection for "sham" peer reviews.  Further, he asked the trial court to continue the hearing 60 to 90 days and to lift the discovery stay imposed by section 425.16 so he could obtain documents he needed to support his allegations.

On September 26, 2012, plaintiff filed and served his own declaration in which he stated that on about August 21, 2003, he admitted a patient in labor to the hospital, and Dr. Uzelac, an employee of Drs. Miller and Goodwin, instructed the nurse to change the name of the attending physician from Dr. Shaham to Dr. Uzelac. Plaintiff wrote a letter to Dr. Ghandi, the department chair, complaining about the incident, and Dr. Miller responded by having Dr. Uzelac submit a complaint about plaintiff to the hospital administration. This was "a highly irregular procedure in that disputes over medical matters, such as the one described above, should have been brought to [the] OBGYN department, not the hospital administration. [¶] . . . Dr. Miller's instigation of an irregular complaint to the Tenet Hospital Administration demonstrates complicity between Dr. Miller and the Hospital Administration from which a jury could infer conspiracy to deprive me of my hospital status and of my constitutional rights. [¶] . . . Following that incident, the number of medical chart peer reviews of my patients at the hospital suddenly shot up dramatically. This was the evidence presented at my judicial review.

". . . In June 2004, the Tenet Hospital Administration asked Dr. Ghandi to do a 'focused' peer review against me. [¶] . . . Dr. Ghandi testified under oath that she initially resisted initiating a focused peer review stating 'We have done peer review on him, and I don't see any reason to do it.' Exhibit #4, a true and correct page of sworn testimony of Dr. Ghandi . . . .

". . . However, Dr. Ghandi nevertheless did order a focused peer review of 32 medical records which had been previously peer reviewed with no significant finding of wrongdoing. [¶] . . . This was a sham peer review because the focused peer review that is the subject of this lawsuit was a duplicate of a harassing peer review that had already been conducted of 32 cases with no finding of wrongdoing! In fact, the result of every one of those cases was a healthy mother and baby.

". . . This was a sham peer review because Dr. Ghandi, Dr. Miller, and Dr. Goodwin were the only doctors willing to testify against me and each gained materially and financially by promoting a sham peer review against me. . . . [¶] . . . The

5

court is referred to the First Amended Complaint which sets out more fully how these defendants interfered with my contract with the San Judas Medical Center by getting San Judas to send its patients to Hospital for the residency program and not as patients of Dr. Shaham, which only benefitted Drs. Ghandi, Goodwin and Miller. [¶] . . . [¶]

". . . In conducting the peer review, the express bylaws of the hospital were not followed; [h]ad they been followed, the three years of judicial review would not have occurred. Had I been given the opportunity to respond to specific charges, there would have not been any evidence to justify a judicial review and no significant damage would have been done.

". . . Based upon information and belief, the hospital and the MEC tried to appoint biased individuals to sit on the judicial review committee (panelists, jury, hearing officer). The hospital selected the employees and associates of . . . those doctors that instigated the peer review for personal financial gain at my expense."

Plaintiff concluded that "[i]f given additional time to obtain discovery, I can show probability of prevailing." Further, he said, "[w]ith additional discovery, I can prove the causes of action in my first Amended Complaint."

Defendants objected to the declaration on the ground that it was not served until two days before the anti-SLAPP hearing. Defendants also objected on evidentiary grounds to particular portions of the declaration.

### III.    Order Granting the Anti-SLAPP Motion

Following the September 28, 2012 hearing on the anti-SLAPP motions, the court took the motions under submission. On October 30, 2012, the trial court granted defendants' motions to strike, finding that: (1) defendants met their initial burden of proving that the conduct alleged in the first amended complaint is "protected activity" under section 425.16; (2) plaintiff did not present any admissible evidence to meet his burden of proving a probability of prevailing on his claims against defendants; (3) plaintiff's request for a continuance to conduct discovery was denied, because plaintiff did not file a noticed motion showing good cause why discovery was necessary

6

(§ 425.16, subd. (g));[3] and (4) plaintiff's declaration in support of his opposition "was not timely served or filed, and therefore has not been considered by this Court."

Notice of entry of the order was served November 21, 2012. Plaintiff timely appealed.

## DISCUSSION

### I. The Anti-SLAPP Law

"The anti-SLAPP law provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' (§ 425.16, subd. (b)(1).) The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. (§ 425.16, subd. (a).)

"The anti-SLAPP law involves a two-step process for determining whether a claim is subject to being stricken. In the first step, the defendant bringing an anti-SLAPP motion must make a prima facie showing that the plaintiff's suit is subject to section 425.16 by showing the defendant's challenged acts were taken in furtherance of his or her constitutional rights of petition or free speech in connection with a public issue, as defined by the statute. (*Jarrow Formulas*, *Inc. v. LaMarche* (2003) 31 Cal.4th 728,

---

[3]    Plaintiff does not contend on appeal that the trial court erred in denying his request for a continuance or to conduct discovery; any such contention therefore is forfeited. (E.g., *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324 ["[A]ppellant must not only present an analysis of the facts and legal authority on each point made, but must also support arguments with appropriate citations to the material facts in the record. If he fails to do so, the argument is forfeited."].)

7

733.)" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 107-108 (*McGarry*).)

"In assessing whether a cause of action arises from protected activity, '"we disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action . . . .' . . . We assess the principal thrust by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.' [Citation.] If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute. [Citation.]" [Citation.]' (*Tuszynska* [*v. Cunningham* (2011)] 199 Cal.App.4th [257,] 267.) '[T]he critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech.' (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

"When evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, 'courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. "[C]auses of action do not arise from motives; they arise from acts." [Citation.]' (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 823 (*Anapol*). '"The court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct is actually being challenged, not to determine whether the conduct is actionable." [Citation.]' (*Id*. at p. 822.)" (*Hunter v. CBS Broadcasting*, *Inc*. (2013) 221 Cal.App.4th 1510, 1520.)

"After the defendant satisfies the first step, the burden shifts to the plaintiff to demonstrate there is a reasonable probability he or she will prevail on the merits at trial. (§ 425.16, subd. (b)(1).) In this phase, the plaintiff must show both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823, disapproved on other grounds in *Equilon Enterprises v. Consumer Cause*, *Inc*. [(2002)] 29 Cal.4th at [53,] 68, fn. 5; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358.) In

8

making this assessment, the court must consider both the legal sufficiency of and evidentiary support for the pleaded claims, and must also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims and, if so, whether there is evidence to negate any such defenses. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398-399.)

"In considering whether a plaintiff has met those evidentiary burdens, the court must consider the pleadings and the evidence submitted by the parties. (§ 425.16, subd. (b)(1), (2).) However, the court cannot weigh the evidence (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 537-538) but instead must simply determine whether the plaintiff's evidence would, if credited, be sufficient to meet the burden of proof. (*Wilcox v. Superior Court*, *supra*, 27 Cal.App.4th at pp. 823-825 [standard for assessing evidence is analogous to standard applicable to motions for nonsuit or directed verdict].)

"On appeal, we review de novo the trial court's ruling on the motion to strike. (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 339.)" (*McGarry*, *supra*, 154 Cal.App.4th at pp. 108-109.)

## II. Defendants Demonstrated That Each Cause of Action Arose From Acts in Furtherance of the Rights of Petition or Free Speech

The first prong of the anti-SLAPP statute requires us to consider whether defendants met their threshold burden of showing that the challenged causes of action arose from activity protected by the anti-SLAPP statute. Plaintiff concedes that speech or petitioning activity made in the context of medical peer review may be protected conduct under the anti-SLAPP statute. He urges, however, that not every act related to peer review is protected, and he relies on *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35 and *Graffiti Protective Coatings*, *Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207 for the proposition that an act that results from peer review or other protected speech is not subject to the anti-SLAPP statute if it is properly characterized as "an act of governance." Applying these principles to the present case, plaintiff contends

9

that all of his claims are based on acts of governance, *not* protected speech or petitioning activity, and thus none is subject to the anti-SLAPP statute.

We begin by surveying appellate decisions that discuss the anti-SLAPP statute in the context of medical peer review or related areas. We then apply these decisions to conclude that each cause of action alleged in the complaint is based on protected speech or petitioning activity and thus is subject to the anti-SLAPP statute.

### A. *Applicable Law*

#### 1. Cases Holding That Speech or Petitioning Activity in Connection With Medical Peer Review Is Subject to the Anti-SLAPP Law

Section 425.16, subdivision (e) provides: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

In *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192 (*Kibler*), the California Supreme Court considered whether a medical peer review is an "official proceeding authorized by law" subject to the anti-SLAPP statute. There, the hospital's peer review committee summarily suspended a physician's medical staff privileges after he behaved violently at work. The physician sued the hospital and some of its doctors and nurses, seeking damages under a variety of theories including defamation, abuse of process, and interference with his practice of medicine. (*Id.* at p. 196.) The defendants moved under section 425.16 to strike the complaint, contending

10

that the lawsuit arose out of the hospital's peer review proceeding, which was an "official proceeding" within the meaning of the statute. The trial court agreed and struck the complaint in its entirety. (*Id*. at p. 197.)

The Supreme Court affirmed. It noted that section 425.16, subdivision (e)(2) defines an "'"'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue"'"' to include "'any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, *or any other official proceeding authorized by law*.'" (*Kibler*, *supra*, 39 Cal.4th at p. 198, italics added.) Kibler's action arose out of written or oral statements or writings made "in connection with" peer review; the issue before the Supreme Court, therefore, was whether the peer review proceeding was an "official proceeding authorized by law" within the meaning of the anti-SLAPP statute. (*Id.* at p. 198.) The Supreme Court concluded that it was. It explained that although peer review is conducted internally by hospital personnel, the Business and Professions Code "sets out a comprehensive scheme that incorporates the peer review process into the overall process for the licensure of California physicians" and a hospital's peer review decisions are subject to judicial review by administrative mandate. (*Id.* at pp. 199-200.) Thus, hospital peer review proceedings "constitute official proceedings authorized by law within the meaning of section 425.16, subdivision (e)(2)." (*Id*. at p. 200.)

The Court of Appeal reached a similar result in *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 (*Nesson*) (revd. in part on other grounds in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655). In *Nesson*, a radiologist brought an action against a hospital for breach of contract, retaliation, and discrimination after the medical executive committee summarily suspended the radiologist's medical staff privileges and the hospital terminated his contract to provide radiology services. (*Id.* at p. 72.) The hospital filed a special motion to strike under the anti-SLAPP statute, arguing that the complaint targeted a protected activity and the radiologist could not demonstrate the probable validity of his claims because he did not exhaust his administrative or judicial remedies. (*Id.* at p. 75.) The trial court granted the

hospital's special motion to strike pursuant to the anti-SLAPP statute, and the radiologist appealed, contending that his summary suspension and subsequent termination did not constitute protected activity. (*Id.* at pp. 76, 78.)

The Court of Appeal affirmed the dismissal of the action. It characterized *Kibler* as holding that "hospital peer review activities, including the discipline imposed upon a physician, constitute "'official proceeding[s] authorized by law.'"'" (*Nesson*, *supra*, 204 Cal.App.4th at p. 78.) The court stated, "[t]he gravamen of each cause of action asserted by Nesson is that the Hospital somehow acted wrongfully when it terminated the [radiology service agreement] because Nesson's privileges were summarily suspended, as he was deemed by the [medical executive committee] to be a likely imminent danger to patient safety." (*Id.* at p. 83.) Thus, the trial court properly found that all causes of action implicated conduct subject to the anti-SLAPP statute. (*Id.* at p. 88.)

## 2. Cases Distinguishing "Communicative" and "Noncommunicative" Conduct

The court distinguished *Kibler* and *Nesson* to deny an anti-SLAPP motion in *Young v. Tri-City Healthcare Dist.*, *supra*, 210 Cal.App.4th 35 (*Young*). There, the physician plaintiff brought an action for administrative mandate challenging a hospital's summary suspension and termination of his medical staff privileges. (*Id.* at p. 39.) The hospital filed a special motion to strike the fifth cause of action, which sought relief from the summary suspension, contending that the alleged misconduct arose solely from protected activity within the meaning of the anti-SLAPP statute—i.e., the conduct of hospital peer review proceedings. (*Id.* at p. 40.) The trial court granted the motion, and the physician appealed, contending that his request for administrative mandate did not arise out of protected speech. (*Id.* at p. 42.)

The Court of Appeal reversed. It explained that even if the conduct of individual public officials in discussing and voting on a public entity's action or decision could constitute an exercise of rights protected under the anti-SLAPP statute, this would not mean that litigation challenging a public entity's action or decision necessarily arises

12

from protected activity because "[a]n act of governance mandated by law, without more, is not an exercise of free speech or petition." (*Young*, *supra*, 210 Cal.App.4th at p. 56.) Thus, the court said, in the context of peer review, a request for judicial review of an administrative decision by a peer review committee must be distinguished from a request for damages based on alleged injury arising from such peer review activity. (*Id.* at p. 57.)

In *Young*, the physician's cause of action sought reversal of the administrative decision, not tort damages. It therefore was not subject to the anti-SLAPP statute:

"The principal thrust of the claim, in terms of any 'allegedly wrongful and injury-causing conduct . . . that provides the foundation for the claim,' will determine the applicability of the anti-SLAPP statutory scheme. (*Martinez v. Metabolife Internat.*, *Inc*. (2003) 113 Cal.App.4th 181, 189.) If the core injury-producing conduct by the defendant that allegedly gave rise to the plaintiff's claim is properly described with only collateral or incidental allusions to protected activity, then the claim does not arise out of protected speech or petitioning activity. (*Id.* at p. 188.)

"The resolution of these anti-SLAPP issues depends upon the initial definition in section 425.16, subdivision (b)(1), of the coverage of the statutory scheme, of any 'cause of action against a person *arising from any act of that person in furtherance of the person's right of petition or free speech* . . . in connection with a public issue [that] shall be subject to a special motion to strike . . . .' (Italics added.) The question should be whether the plaintiff is seeking relief from the defendant for its protected communicative acts. (*Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790, 806.) . . .

"'Even if the conduct of individual public officials in discussing and voting on a public entity's action or decision could constitute an exercise of rights protected under the anti-SLAPP statute[,] . . . this does not mean . . . litigation challenging a public entity's action or decision always arises from protected activity.' (*San Ramon* [*Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004)] 125 Cal.App.4th 343, 346-347.) An act of governance mandated by law, without more, is not an exercise of free speech or petition. (*Id.* at p. 354.) [¶] . . . [¶]

13

"[E]ven though a hospital peer review proceeding qualifies as an 'official proceeding' . . . , we must still determine whether the basis of [plaintiff's] claim arises out of 'any written or oral statement or writing made in connection with an issue under consideration' by the peer review proceeding. (§ 425.16, subd. (e)(2).) Young's fifth cause of action alleges that he is entitled to judicial review of the administrative decision, and he does not seek damages on tort theories. He attacks the [December 2008] summary suspension as not carried out properly by a qualified committee, and claims the review of his records was done improperly. We think this claim of entitlement to judicial review of allegedly prejudicial administrative action is based on and arose out of his statutory rights under section 1094.5, and is separate and different from an action for damages that arose out of the content of the allegedly wrongful peer review statements, such as the court[] in *Kibler*, *supra*, 39 Cal.4th 192 . . . [was] considering . . . ." (*Young*, *supra*, 210 Cal.App.4th at pp. 55-58.)

In reaching its conclusion, *Young* relied on *Graffiti Protective Coatings*, *Inc. v. City of Pico Rivera*, *supra*, 181 Cal.App.4th 1207 (*Graffiti*), a case on which Shaham also relies. There, plaintiff Graffiti Protective Coatings (GPC) had a contract with the City of Pico Rivera (city) to perform maintenance on city bus stops. The contract was for one year, to be automatically extended four additional years unless either party notified the other of its intent not to extend. Several years into the contract, GPC received a notice of nonrenewal; it later learned that the bus stop contract had been given to a competitor (NES), which had hired one of GPC's former employees (Velasquez). (*Id.* at p. 1212.)

GPC sued the city and others. As relevant here, GPC asserted that the city had violated the Public Contract Code and the city's municipal code by failing to award the contract through competitive bidding, and it sought (1) a declaration that the contract between the city and NES was void, and (2) an order compelling the city to award the maintenance contract through competitive bidding. (*Graffiti*, *supra*, 181 Cal.App.4th at pp. 1212-1213.) The city filed an anti-SLAPP motion, contending that the claims against it were based on its communications with GPC, Velasquez, and NES regarding

14

maintenance of the city's bus stops, and that GPC was unlikely to prevail on the merits of its claims. The trial court agreed and granted the motion. (*Id.* at p. 1213.)

The Court of Appeal reversed. It explained that in deciding whether an action is a SLAPP, the trial court "should distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity. Prelitigation communications or prior litigation may provide evidentiary support for the complaint without being a basis of liability. An anti-SLAPP motion should be granted if liability is based on speech or petitioning activity itself." (*Graffiti*, *supra*, 181 Cal.App.4th at pp. 1214-1215.) In *Graffiti*, even if the city's decisions to terminate the maintenance contract with GPC and to enter into a new contract with NES were considered or reviewed in an official proceeding, GPC's claims were not based fundamentally on a statement or writing made in connection with the city's selection of a new contractor. (*Id*. at p. 1218.) The court explained: "[T]he prelitigation communications between the City and others are helpful in establishing the events leading up to the termination of GPC's contract. The communications assist in telling the story. But GPC's claims against the City are not based on those communications. Rather, liability is premised on state and municipal laws requiring the City to award certain contracts through competitive bidding. A petition for a writ of mandate and a request for declaratory relief, as set forth in the complaint, are appropriate means to determine whether the City complied with those laws. To conclude that GPC's claims are subject to the anti-SLAPP statute would require GPC to demonstrate a probability of prevailing on the merits at the pleading stage, a result that would discourage attempts to compel public entities to act lawfully." (*Id*. at p. 1215.)

### B. Analysis

Plaintiff's complaint appears generally to allege that defendants engaged in two distinct kinds of misconduct: (1) initiating and conducting peer reviews against plaintiff for which there was no factual basis and no notice and opportunity to respond; and (2) using the fabricated accusations in the peer review proceedings to disparage plaintiff

15

to colleagues in order to disrupt his professional relationships. In the following section, we discuss each of these claims in the specific causes of action in which they appear.

### 1. Antitrust Claims (First and Second Causes of Action)

The first and second causes of action, for violations of federal and state antitrust statutes, allege that the defendants "conspired with one another to perform false and malicious peer review against Dr. Shaham in order to cause the loss of his privileges . . . . They did so by using and performing reviews by persons who were unqualified and/or who were biased competitors and who were motivated by anti-competitive intent. [¶] . . . These reviewers published false and inaccurate written reviews, in many cases contrary to well established medical principles, for the purpose of harming Dr. Shaham, all in an effort to pursue their anti-competition goal of causing the loss of privileges. The HOSPITAL subsequently retained witnesses and reviewers who adopted falsehoods and inaccuracies as in their OB GYN review."[4]

The essence of the misconduct alleged in these causes of action appears to be statements and reports—"false and inaccurate written reviews" and "witnesses and reviewers who adopted falsehoods and inaccuracies"—made during and in connection with peer review proceedings. Under *Kibler*, such statements and reports are "written or oral statement[s] or writing[s] made before" or "in connection with" an "official proceeding authorized by law." They thus are subject to the anti-SLAPP statute. (*Kibler*, *supra*, 39 Cal.4th 192.)

Plaintiff contends that the first and second causes of action are not subject to the anti-SLAPP statute because the core injury-producing conduct alleged is that defendants "individually and collusively, engaged in a multiplicity of wrongful and anticompetitive

---

[4]    Plaintiff urges in his appellant's opening brief that the "gravamen" of his first two causes of action is statements the defendants made outside the peer review process, not within it. We do not believe such a characterization is consistent with the language of the first amended complaint, but even if it were, the first and second causes of action would still be subject to the anti-SLAPP statute for the reasons discussed in section II(B)(3), *infra.*

conduct with the intent to remove plaintiff as a competitor." Not so. As courts repeatedly have said, the anti-SLAPP statute's """"definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.""""" (*Graffiti*, *supra*, 181 Cal.App.4th at p. 1218.) Further, when evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, "courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. '[C]auses of action do not arise from *motives*; they arise from *acts*.' [Citation.]" (*Anapol*, *supra*, 211 Cal.App.4th at p. 823, italics added.) "'The statute applies to claims "based on" or "arising from" statements or writings made in connection with protected speech or petitioning activities, regardless of any motive the defendant may have had in undertaking its activities, or the motive the plaintiff may be ascribing to the defendant's activities.' (*Tuszynska v. Cunningham*, *supra*, 199 Cal.App.4th at p. 269.)" (*Anapol*, *supra*, at p. 823.) Thus, if, as here, the alleged tort is committed *by means of* speech or petitioning activity, it is subject to the anti-SLAPP statute—even if, as plaintiff asserts, the defendants' *motives* were anticompetitive.

Plaintiff also contends that his claims are not subject to the anti-SLAPP statute because, as in *Young* and *Graffiti*, they are based fundamentally on acts of governance, not protected speech. He says: "In order to circumvent the procedural safeguards of fairness and due process embedded in the peer review statute and the hospital bylaws, [defendants] conducted informal peer reviews without notice to [plaintiff] or an opportunity to respond, and without detailed written requests for investigation, as required. [Defendants] used the baseless accusations to disparage [plaintiff ] and interfere with his professional business affiliations." (Emphasis omitted.) Such conduct is not protected, plaintiff urges, because "[a]s in *Young*, [plaintiff] herein challenges [defendants'] violations of the peer review procedures and contends that unlawful violation of statutory procedures to accomplish an unlawful objective is non-communicative conduct. [Plaintiff] herein relies on *Graffiti*, as did the Court in *Young*[,]

17

[for the proposition] that a violation of procedures does not arise out of protected speech."

We do not agree with plaintiff that his antitrust causes of action are based fundamentally on acts of governance—namely, alleged procedural violations in the conduct of the peer review—rather than protected speech. As we have said, the first and second causes of action are replete with allegations to the effect that defendants "published false and inaccurate written reviews" and "retained witnesses and reviewers who adopted falsehoods and inaccuracies." Because these kinds of allegations implicate protected speech, they are subject to the anti-SLAPP statute.

Moreover, even if we were to conclude that the gravamen of the antitrust causes of action is alleged procedural violations, we still would not agree that the present case is governed by *Young* and *Graffiti*. In both those cases, the "core injury-producing conduct" alleged (*Young*, *supra*, 210 Cal.App.4th at p. 55) was a governmental, administrative, or quasi-administrative *decision*—in *Young*, the suspension of plaintiff's hospital privileges, and in *Graffiti*, the termination of plaintiff's contract and the award of the contract to a competitor. Although improper procedures were alleged to have resulted in these injurious acts, it was the *decisions themselves*, not the procedures leading to those decisions, on which liability was premised. The present case is different. Plaintiff does not challenge any *decision* by the hospital—to the contrary, he alleges that "he was completely exonerated" and his staff privileges remained intact—and he challenges only the *procedures* that led up to his exoneration.

Further, in both *Young* and *Graffiti*, the plaintiffs sought reversal of the underlying decision, not tort damages. The *Young* court emphasized the significance of the limited scope of relief the plaintiff sought, noting that "[plaintiff's] request for judicial relief from an administrative decision should be distinguished from requests for damages that are fundamentally based on alleged injury arising from . . . peer review activity." (*Young*, *supra*, 210 Cal.App.4th at p. 57.) It continued: "We think [plaintiff's] claim of entitlement to judicial review of allegedly prejudicial administrative action is based on and arose out of his statutory rights under section 1094.5, *and is separate and different*

18

*from an action for damages . . . ."* (*Id.* at p. 58.) The present case, in contrast, seeks tort damages, not reversal of the underlying peer review decision.

Finally, where, as here, a cause of action is based on several distinct factual circumstances, a defendant meets its burden to show a claim is subject to the anti-SLAPP statute if one of these factual circumstances supports the application of the statute, unless the protected conduct is """"merely incidental""""" to other alleged unprotected conduct. (*Haight Ashbury Free Clinics*, *Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1551; *Peregrine Funding*, *Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672; *Mann v. Quality Old Time Service*, *Inc*. (2004) 120 Cal.App.4th 90, 103.) If there are multiple factual grounds underlying a cause of action, the court must examine whether the claim is at least partially based on protected activity that is not incidental. (*Haight Ashbury*, *supra*, 184 Cal.App.4th at pp. 1550-1553; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1287 ["mixed cause of action is subject to section 425.16 if at least one of the underlying acts is protected conduct, unless the allegations of protected conduct are merely incidental to the unprotected activity"]; *Mann*, *supra*, 120 Cal.App.4th at p. 103.) "[W]here the defendant shows that the gravamen of a cause of action is based on nonincidental protected activity as well as nonprotected activity, it has satisfied the first prong of the SLAPP analysis." (*Haight Ashbury*, *supra*, at p. 1551, fn. 7.) Thus, even if the first two causes of action allege some conduct that did not arise from constitutionally protected activity, the causes of action are nonetheless subject to the anti-SLAPP statute because they also allege nonincidental conduct that is subject to the statute.

2. Breach of Contract and Violation of the Federal Health Care Quality Improvement Act (Third and Fourth Causes of Action)

The third and fourth causes of action for breach of contract and violations of the Federal Health Care Quality Improvement Act (HCQIA) allege procedural violations of the hospital bylaws and the HCQIA. Specifically, these causes of action allege that the bylaws and HCQIA provide procedures for monitoring and correcting the performance of

19

the medical staff, and that defendants violated these procedures by reviewing plaintiff's cases without advising him that such reviews were being undertaken, permitting concerns to be raised about plaintiff's quality of care by his economic competitors, encouraging plaintiff's competitors "to identify as many 'problems' in Dr. Shaham's quality of care as they possibly could, where their zeal carried to the point that they made negligent, reckless and intentional misstatements," "reach[ing] harshly critical conclusions about the level of medical care provided by Dr. Shaham," "providing false reviews and relying upon incompetent reviewers," generating "reviews [that] were based on arbitrary as opposed to authoritative stands or review and were riddled with misrepresentations, inaccuracies and misstatements," "knowingly present[ing] false reports and false testimony," and "conducting a limited and biased false review by economic competitors, many of whom w[e]re not qualified to . . . perform the reviews [and] who should not have been allowed to perform the reviews." Like the first and second causes of action, the third and fourth causes of action thus are based in significant part on statements and reviews made in peer review proceedings, and for the reasons discussed above they therefore are subject to the anti-SLAPP statute.

### 3. Business Disparagement, Slander, and Libel (Fifth Cause of Action)

The fifth cause of action for disparagement, slander, and libel alleges that "[t]he reviews to which Dr. Shaham was subjected and the false allegations made regarding the cases reviewed, through the action of Defendants, as set forth above has been communicated by the Defendants to other physicians, HOSPITALs, patients and individuals . . . . Defendants allowed the information regarding Dr. Shaham's peer review to be published to various members of the HOSPITAL's medical staff immediately (including specifically Dr. Shaham's referral doctors and those affiliated with San Judas medical clinics), such that Dr. Shaham was labeled a 'dangerous doctor'

20

well in advance of a hearing.  [¶]  . . . The Defendants['] communications were slanderous and libelous per se . . . ."**5**

Because the subject of the allegedly defamatory statements to plaintiff's colleagues was plaintiff's peer review, these statements arguably were made "in connection with" peer review within the meaning of section 425.16, subdivision (e)(2). In the alternative, the allegedly defamatory statements were made "in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue" within the meaning of section 425.16, subdivision (e)(4).  There appears to be no real dispute that a defamation claim implicates free speech.  Further, the quality of a physician's patient care is an issue of public interest.  (E.g., *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 343-344 [newspaper article about medical practitioner involved issue of public interest where information would assist others in choosing doctors]; *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 47 ["matters of health . . . are undeniably of interest to the public"]; see also *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 165 [physician's alleged unlawful dispensing of controlled substances was an issue of great public interest].)  Because the fifth cause of action alleges that defendants made defamatory statements concerning the quality of plaintiff's patient care, it is based on conduct in furtherance of the right of free speech in connection with a public issue, and thus it is subject to the anti-SLAPP statute.

---

**5**     The complaint does not detail the allegedly defamatory statements, but appellant's opening brief asserts that the wrongful conduct of defendants includes "[f]alse statements made directly to the University of Southern California Medical School denouncing plaintiff in order to take over plaintiff's clinical professorship," "[f]alse statements made directly to San Judas Medical Center denouncing plaintiff in order to take over plaintiff's practice at the San Judas Medical Center," "[f]alse statements made directly to Hollywood Presbyterian Medical Center denouncing plaintiff in order to take over plaintiff's emergency room practice," and "[f]alse statements denouncing plaintiff made directly to referring physicians in clinics throughout Los Angeles."

21

4. Tortious Interference With Business, Tortious Interference With Prospective Economic Advantage, and Violations of the Deceptive Trade Practices Act (Sixth, Seventh, and Eighth Causes of Action)

The sixth and seventh causes of action, for tortious interference with business and with prospective economic advantage, allege that "the publication of the peer reviews, judicial reviews and the fact [plaintiff] was wrongfully blackballed from the [emergency room] calls and working with the USC [obstetrics] residents' program," "[t]he sham peer reviews and blackballing of Dr. Shaham through the actions of the Defendants," and "the publication" of the peer reviews to plaintiff's colleagues improperly influenced other hospitals, physicians, patients, and other health care organizations not to deal with plaintiff and thus interfered with his existing and prospective professional relationships. The eighth cause of action, for violations of the Deceptive Trade Practices Act, incorporates the prior allegations by reference and alleges that such alleged conduct "[d]isparag[es] the goods, services, or business of another by false or misleading representation of facts."

Because the sixth, seventh, and eighth causes of action, though framed as business torts, are based fundamentally on defendants' alleged statements to medical colleagues about plaintiff's peer reviews and his clinical skills and judgment, for all the reasons stated above they are subject to the anti-SLAPP statute under either subdivision (e)(2) or subdivision (e)(4) of section 425.16.

5. Intentional Infliction of Emotional Distress (Ninth Cause of Action)

The ninth cause of action for intentional infliction of emotional distress incorporates the prior allegations by reference and alleges that defendants caused plaintiff severe emotional distress by "[t]he sham peer review, the blackballing and suspension of privileges." Because this cause of action appears to have the same factual predicate as those discussed above, it too is subject to the anti-SLAPP statute for all the reasons previously discussed.

22

6. <u>Injunctive and Declaratory Relief (Tenth and Eleventh Causes of Action)</u>

The tenth and eleventh causes of action seek injunctive and declaratory relief. However, injunctive and declaratory relief are equitable remedies, not causes of action. (*Faunce v. Cate* (2013) 222 Cal.App.4th 166, 173; *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1360, fn. 2, citing 4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, §§ 40-41, pp. 105-107; *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 618.) Because the anti-SLAPP statute applies only to "causes of action" (§ 425.16, subd. (b)(1); *Wong v. Jing*, *supra*, at p. 1360, fn. 2), for purposes of our analysis we focus on plaintiff's substantive claims and do not separately consider the purported causes of action for injunctive and declaratory relief.

7. <u>Denial of Due Process, Violation of the California Medical Practice Act, Business and Professions Code Section 809 Et Seq., and Malicious Peer Review Action (Twelfth, Thirteenth, Fourteenth, and Fifteenth Causes of Action)</u>

The twelfth cause of action incorporates the prior allegations by reference and alleges that plaintiff was "denie[d] [his] due process right[s]." The thirteenth cause of action, for violation of the California Medical Practice Act, incorporates the prior allegations by reference and alleges that the "actions and conduct of Defendants described herein, in commencing and continuing a peer review investigation of Dr. Shaham, were taken with malice as defined under California law, and without a reasonable basis." The fourteenth and fifteenth causes of action are similar: the fourteenth alleges that defendants "knowingly and willfully [brought] a bogus and bad faith action against Dr. Shaham's medical staff privileges, alleging substandard medical care, even though defendants were well aware that Dr. Shaham had committed no wrongdoing whatsoever;" the fifteenth alleges that defendants "instituted a malicious peer review action against Plaintiff, in bad faith, despite knowing that [it] had no merit

23

whatsoever" and that the peer review "was a sham because . . . Defendants did not follow hospital bylaws [or] other required protocols."

Like the first four causes of action, the essence of the misconduct alleged in the twelfth, thirteenth, fourteenth, and fifteenth causes of action appears to be statements and reports made during and in connection with peer review proceedings. Because such statements and reports constitute written or oral statements or writings made "before" or "in connection with . . . [an] official proceeding authorized by law," they are subject to the anti-SLAPP statute. (*Kibler*, *supra*, 39 Cal.4th 192.)


## III.   Plaintiff Failed to Demonstrate a Probability of Prevailing

If the court finds the defendant met its burden to show the cause of action arose from protected activity, it then must proceed to the second step of the analysis: whether the plaintiff has established a probability of prevailing on the claim. In this step, the burden shifts to the plaintiff to """"demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."""" (*Oasis West Realty*, *LLC v. Goldman* (2011) 51 Cal.4th 811, 820; *ComputerXpress*, *Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010.) To make a prima facie showing a plaintiff is required "to '"state[] *and substantiate*[] a legally sufficient claim. [Citations.]"' [Citation.] More specifically, he had to adduce *competent*, *admissible evidence* that the claims were """"legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment . . . ." [Citation.]"" [Citations.]" (*Dwight R. v. Christy B.* (2013) 212 Cal.App.4th 697, 713-714, italics added.)

In the present case, the only evidence plaintiff submitted in opposition to the anti-SLAPP motion was his own declaration and supporting exhibits. The declaration was not timely filed, however, and defendants objected to the trial court considering it. The trial court sustained the objection, stating in its order that "Dr. Shaham's declaration in

support of his Opposition was not timely served or filed, and therefore has not been considered by this Court."**[6]**

Plaintiff does not contend on appeal that the trial court's ruling was an abuse of discretion, and thus the issue is forfeited. (E.g., *Nielsen v. Gibson*, *supra*, 178 Cal.App.4th 318, 324.) Without the declaration and exhibits, there is *no* evidence before us to establish plaintiff's likelihood of prevailing on the merits, and thus we necessarily conclude that the second prong of the anti-SLAPP test was not met.

In any event, even if we were to consider plaintiff's declaration on the merits, it would not establish a prima facie case for any cause of action alleged in the first amended complaint.**[7]** "'Prima facie evidence' is defined as '[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced.' (Black's Law Dict. [(9th. ed. 2009)] pp. 638-639.)" (*People v. Skiles* (2011) 51 Cal.4th 1178, 1186.) In the present case, plaintiff's declaration contains no real evidence that the defendants made false statements about plaintiff's medical competency, either during peer review proceedings or at any other time. While the declaration is replete with unsupported *assertions* of wrongdoing by defendants, such assertions, without more, do not establish a prima facie case.**[8]** (E.g., *Alpha & Omega Development*, *LP v. Whillock Contracting*, *Inc.*

---

**[6]** In his appellant's reply brief, plaintiff urges, citing the late-filed reporter's transcript, that the trial court "accepted and considered" his declaration on the merits. We have reviewed the reporter's transcript and we believe it clear that, although the trial court entertained argument on the admissibility of plaintiff's declaration, it did not consider it on the merits. ("The Court: . . . Having filed a . . . declaration two days before the hearing, which is well beyond the time that it should have been filed, and expect the court to brush that aside and give him extra opportunity that the average person would not get . . . goes against the statute.")

**[7]** Because we so conclude, we need not reach Tenet's contention that all of the conduct alleged in the complaint occurred after it sold the hospital to CHA Hollywood Medical Center.

**[8]** By way of example, plaintiff alleges as follows: "Because of this review, I was forced out of the emergency room practice by Dr. Ghandi and the administration . . . . [¶] . . . The court is referred to the First Amended Complaint which sets out more fully how

25

(2011) 200 Cal.App.4th 656, 664 ["'[D]eclarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded.'"]; *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 625 ["The only evidence offered by [parties] to prove their prima facie case was [party's] own uncorroborated and self-serving declaration, which consisted of hearsay and speculation.  [Citation.]  This was insufficient to meet their burden."].)

## DISPOSITION

The judgment of dismissal is affirmed.  Defendants are awarded their appellate costs.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EDMON, J.[*]

We concur:

EPSTEIN, P. J.                    WILLHITE, J.

---

these defendants interfered with my contract with the San Judas Medical Center by getting San Judas to send its patients to Hospital for the residency program and not as patients of Dr. Shaham, which only benefited Drs. Ghandi, Goodwin and Miller" and "Based upon information and belief, the hospital and the MEC tried to appoint biased individuals to sit on the judicial review committee."

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

26